**MEM**
THE PARIENTE LAW FIRM, P.C.
MICHAEL D. PARIENTE, ESQ.
Nevada Bar No. 9469
3960 Howard Hughes Parkway, Suite 615
Las Vegas, Nevada 89169
(702) 966-5310
Attorney for Defendant

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>SETH WITTNER,<br><br>    Defendant. | Case No.: 2:17CR00005-001<br><br>**SENTENCING MEMORANDUM** |

### SETH WITTNER'S SENTENCING MEMORANDUM

Defendant SETH WITTNER, through undersigned counsel, submits this memorandum in advance of sentencing. As explained below, Mr. Seth Wittner respectfully contends that a sentence of probation would satisfy the objectives set forth in 18 U.S.C. § 3553(a).

### BACKGROUND AND PROCEDURAL HISTORY

On February 23, 2017, Mr. Wittner pleaded guilty to one count of Possession of Child Pornography, a violation of 18 USC § 2252A(a)(5)(B). He was given a personal recognizance bond and has been in compliance with the terms of his pre-trial release.

The probation officer subsequently prepared a Presentence Investigation Report ("PSR"). The PSR assigned Mr. Wittner a Total Offense Level of 28, reflecting a Base Offense Level of 18, plus 13 levels for a various Specific Offense Characteristics, minus

3 levels for his full and timely acceptance of responsibility. Combining this Total Offense Level of 28 with Mr. Wittner's Criminal History Category of I, the PSR determined that he faces an advisory Guidelines range of 78 months to 97 months.

## DISCUSSION

It is now well-established that the Court should perform the following four steps when sentencing a defendant: (1) calculate the sentencing range recommended by the advisory Guidelines; (2) determine whether a sentence within that range, and within statutory limits, serves the factors set forth in 18 U.S.C.§ 3553(a), and, if it does not, select a sentence that does serve those factors; (3) implement any applicable mandatory statutory limitations; and (4) articulate the reasons for selecting the particular sentence and, if applicable, explain why a sentence outside the advisory Guidelines range better serves the relevant sentencing purposes set forth in 18 U.S.C. § 3553(a). *See Gall v. United States*, 552 U.S. 38, 51 (2007).

> A district court is required to "consider" the § 3553(a) factors both in the initial imposition of a sentence and in any subsequent reduction of a sentence after the modification of a guidelines range by the Sentencing Commission. *See* 18 U.S.C. § 3582(a) (upon imposition of term of imprisonment, sentencing court "shall consider the factors set forth in section 3553(a) to the extent that they are applicable"); 18 U.S.C. § 3582(c)(2) (court "may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent they are applicable").

*U.S. v. Trujillo*, 713 F.3d 1003, 1009 (9th Cir. 2013)

**A. The Court Should Downwardly Depart from the Advisory Guidelines**

Under the first step of the sentencing process outlined above, the Court should calculate Mr. Wittner's advisory Guidelines. Although Mr. Wittner's advisory Guidelines range is 78-97 months, the Guilty Plea Agreement in this case allows him to argue for a sentence as low as probation in Zone A. Taking these factors into

account, Mr. Wittner respectfully submits that the Court should grant his request for a downward departure. This Honorable Court has the discretion to depart downwards. Judges "may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," *Kimbrough*, 128 S. Ct. at 570 (internal quotation marks omitted), and when they do, the courts of appeals may not "grant greater fact-finding leeway to [the Commission] than to [the] district judge." *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007).

### B. Consideration of the § 3553(a) Factors Supports an Advisory Guidelines Sentence of Probation

In conducting the second step of the sentencing process, "[t]he Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). The Court should consider, among other factors, (1) the nature of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to provide adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed training, medical care, and/or correctional treatment; (3) the kinds of sentences available; and (4) the need to avoid unwarranted sentencing disparities among defendants. *Id.*

#### i. Nature and Circumstances of the Offense

Mr. Wittner respectfully submits that a sentence of probation would more than reflect the nature and seriousness of his offense. As set forth in the PSR, Mr. Wittner did possess various child pornographic videos. Mr. Wittner has never been arrested or accused of having produced a child pornographic image, nor has he ever been arrested

or accused of having had inappropriate conduct with a minor child. There is no evidence that Mr. Wittner ever participated in collecting and viewing these types of images previously.

Mr. Wittner has acknowledged his wrongful conduct and accepts that some sort of punishment is necessary. Although a serious offense, it should be noted that this is not a typical federal child pornography case with thousands of images and videos seized. Mr. Wittner was found to have on his computer a total of 41 videos, five of which were duplicates bringing the total to 36 videos.

**ii. History and Characteristics**

A sentence of probation or any combination of sentencing options involving home confinement or a halfway house would also reflect Mr. Wittner's positive history and characteristics. Mr. Wittner has numerous friends and family who attest to his overall great character. Attached are letters from his sister and two co-workers who attest that he is a decent and hardworking man who acted totally out of character in possessing these images. The first letter is from his sister Wendy Perrone. The second letter is from Peter Cattan who has known Mr. Wittner since 1969 when the two met in college. The third letter is from Dr. Mohamed Ahmed, M.D. who has worked with Mr. Wittner for many years. The common thread that ties these letters together is that Mr. Wittner has been a responsible, caring, compassionate, hard working physician assistant who is multitalented as evidence by his ability to speak multiple languages and compose symphonies.

Mr. Wittner also, on his own, began seeing a counselor for his problems which form the basis of the criminal charges for which he will be sentenced. Attached is an

evaluation from Dr. Mark Chambers which lists Mr. Wittner as a low risk to reoffend based on three tests performed by Dr. Chambers on Mr. Wittner. Also attached is a summary treatment letter from Daniel Berarducci who has been treating Mr. Wittner with at least 20 counseling sessions since January 14, 2017.

Mr. Wittner has otherwise lived an exemplary life, both personally and professionally. As noted in the PSR, Mr. Wittner has no prior criminal record. He is educated, having earned a Bachelor's Degree and a Master's Degree. He has worked his entire life as a productive citizen and has composed symphonies for the Dallas Symphony Orchestra, the Denver Orchestra and for the San Juan Capistrano Symphony.

Mr. Wittner is deeply remorseful for his crime. This has been the most important lesson for Mr. Wittner who has vowed that he will never do anything like this again. He also will seek to restore the trust that once existed in his relationship with family, friends and co-workers. While his friends, family and co-workers remain supportive, they feel let down by Mr. Wittner's terrible decision to allow this wrongful conduct to put this kind of strain on his relationship with them, and Mr. Wittner feels a terrible sense of guilt for letting them down.

Mr. Wittner's willingness to ask for the forgiveness of those closest to him and of this Court is in keeping with the character and integrity Mr. Wittner has exhibited throughout his life, notwithstanding his criminal conduct in this case.

### iii. Seriousness of the Offense, Just Punishment, and Adequate Deterrence

Mr. Wittner will forever be labeled as a "sex offender" and will be under lifetime supervision. His felony status coupled with his status as a sex offender will close many

5

doors of opportunities that once existed and will likely result in the loss of his licenses to work as a licensed physician assistant. The profession in which he once flourished and helped many patients will no longer be an option for him.

A probationary sentence more than deters Mr. Wittner from committing future crimes of this nature. It would be difficult to argue that a sentence of probation with lifetime registration as a sex offender provides more of a deterrence than a sentence of imprisonment. A sentence of probation, home confinement, or halfway house, coupled with lifetime supervision is sufficient deterrence.

Finally, Mr. Wittner is no longer a threat to the community as evidenced in his 100% compliance with house arrest. He continues to this day on House Arrest in his federal charges and has unfailingly abided by each condition imposed on him.

## CONCLUSION

Wherefore, for the foregoing reasons, Mr. Wittner respectfully requests that the Court depart downward from the Federal Sentencing Guidelines and sentence Mr. Wittner to probation, home detention, halfway house or a combination thereof.

Respectfully submitted,

MICHAEL D. PARIENTE, ESQ.
The Pariente Law Firm, P.C.,
3960 Howard Hughes Pkwy, Suite 615
Las Vegas, Nevada 89169
Attorney for Defendant

# Exhibit D-1

May 1, 2017

RE: Seth Wittner

Your Honor,

My name is Wendy Perrone and my brother is Seth Wittner. Seth pleaded guilty to the charge of possession of child pornography and is due to be sentenced on May 24, 2017. My brother has committed a crime but he is not someone who should be in prison.

My older brother, Seth, has always been a positive role model for me. He was a good student throughout his high school, college and post BA studies. He encouraged me to follow my dream of becoming a Special Education Teacher and even drove me to visit some schools prior to making my decision. Seth is able to speak a few languages and is an excellent musician; able to compose as well as play music. At age 47, Seth went back to school and became an excellent Physician Assistant; practicing for the past 17 years. I believe that it would be in the best interest of society, and my brother, if he was able to remain on House Arrest, along with court ordered Community Service, and any other provisions the court may require. My brother was able to help many people as a PA and the physician that Seth worked for even expressed a desire to have him continue to work in that office if his sentence allowed for employment. My family is also very supportive of Seth receiving House Arrest instead of prison time, as punishment for the crime he committed.

Seth has always been a good, law-abiding person. He is aware of the gravity of his actions and the pain his actions have caused others. He has stated that he truly wants to make amends and I know that he will adhere to whatever demands the court would require him to follow, if he was given the opportunity to be sentenced to House Arrest. Since being placed under arrest, my brother has been diligent about demonstrating that he is remorseful, able to abide by the rules of House Arrest, and will not reoffend.

Since being arrested, Seth immediately started counseling and continues to go on a regular basis, to this day. He also mailed his computer, Kindle and WIFI card to my home. When his therapist suggested that he should read a certain book, he texted the title to me so that I could purchase it from Amazon and have it sent to his home. I feel confident that my brother will continue to work to show the court/family/friends that he has taken responsibility for his crime and rehabilitation. I believe in Seth so much that my husband and I will be traveling to Las Vegas so that we can accompany him on May 24, 2017, when he appears in court for sentencing.

I am thankful to you for taking the time to read my letter and grateful for any consideration you may give to my request for leniency (House Arrest) for my brother. I know that if you can grant Seth this ...... it will not be wasted or regretted. Please give him a chance.

Respectfully submitted,

*Wendy Perrone*

Peter Cattan<br>
Chemin de Valérie 45 C<br>
CH-1292 Chambésy<br>
Switzerland<br>
<br>
April 18, 2017

The Honorable Kent Dawson
US Federal Court
333 Las Vegas Blvd South
Las Vegas, Nevada 89101 USA

Re: Seth Wittner

Your Honor:

I have known Seth for many years. We were in college together from 1969 to 1972, lost touch after graduation and re-established contact in the 1990s. Since then, we have stayed in touch regularly, sharing news about our lives.

About a month and a half ago, Seth sent me a letter telling me he had downloaded child pornography and was now facing the possibility of prison. He has since sent me two more letters. All express his regret and remorse. He is hoping you will decide in favor of probation, as his lawyer seems to believe this is a possibility. I am dismayed to learn about Seth and child pornography. At the same time, I do not believe society would benefit by sending Seth to prison.

I know Seth to be kind, intelligent and dedicated to his profession, that of physician assistant. He has frequently expressed joy and satisfaction at being good at his job. I know that he places particular importance on being able to communicate well with his patients, on several occasions going so far as to use Google Translate to help overcome language barriers with non-English speakers. Early in Seth's career when he worked as a physician assistant in a prison, he tenaciously battled institutional inertia to successfully address important health needs of the inmates there. It has always seemed to me that as a physician assistant Seth goes the extra mile to help others.

Seth's letters clearly indicate to me that he knows what he did is wrong and he very much regrets it. He also writes that since October 2016 he has been seeing a therapist and he feels it is helpful. He wants to go forward with his life, perhaps doing community service providing health care to those who are economically disadvantaged. Society can benefit from dedicated health care professionals like Seth. I cannot imagine what it would gain by sending him to prison. I urge you to grant probation in this case.

Respectfully yours,

Peter Cattan

433 Indigo Springs
Henderson, Nevada 89014

March 25, 2017

To The Court

Your Honor:

I am writing to you to recommend Seth Wittner for probation.

I have known Seth since 2006 and have been in steady contact with him. We both worked for Southwest Cardiovascular Associates and I was one of his supervising physicians. We joined the group at the same time.

I am an interventional cardiologist. Seth worked for this group six years until there was a big layoff. We have stayed in touch and we have sat and talked together at medical lectures and dinners. He has been to my home many times.

Seth is one of the most thoughtful people I know. It was a big shock when he told me he had child pornography and was in trouble with the legal system. I was sad to hear this and I do not know why he did it, but I know him well and I am confident he will not do anything like that again. It was hard for me to believe it at first, but he was very ashamed when he told me and that is how I knew it was true.

In our six years working together Seth did excellent work and made sure to give every patient the best possible care. When he had questions he asked me or one of my colleagues. He did not take chances with lives. He was not too proud to ask for help.

Your Honor, I know that Seth Wittner has a lot to contribute to the local society. He is a good person. I hope the Court will see fit to grant him probation.

Respectfully,

*[signature]*

Mohamed S. Ahmed MD

**MARK J. CHAMBERS, PH.D., L.L.C.**
CLINICAL AND FORENSIC PSYCHOLOGIST

8275 S. EASTERN AVE., STE. 200
LAS VEGAS, NEVADA 89123

## Forensic Psychological Evaluation

**NAME:** Seth Wittner
**D.O.B.:** 9/15/52
**DATE INTERVIEWED:** 11/23/16
**SUBJECT:** Risk to reoffend

### SOURCES OF DATA:

Interview of defendant by Mark J. Chambers, Ph.D

### REFERRAL AND BACKGROUND INFORMATION:

Mr. Wittner was referred by his attorney, Michael Pariente, for an evaluation to assess his risk to reoffend. According to available information, the defendant has been arrested and is facing charges for possession of child pornography.

Mr. Wittner was interviewed for the present evaluation in the examiner's private office. Prior to the start of the interview, he was informed of the purpose of the evaluation and the limits of confidentiality. He indicated that he understood these instructions and verbally consented to proceed with the evaluation.

### MENTAL STATUS:

Mr. Wittner communicated effectively throughout his interview and did not hesitate to answer questions. His affect (emotional demeanor) was appropriate, and there were no indications of homicidal or suicidal ideation. Although no formal assessment of the defendant's intellectual ability was conducted, he appeared to be of approximately average intelligence. He exhibited no significant problems with either recent or remote memory and was oriented to time, person, and place. No thought disorder, active hallucinations, or delusional thinking were noted.

### DEFENDANT'S ACCOUNT OF CURRENT OFFENSE:

Mr. Wittner reported that in June of 2015, local police and Homeland Security served him with a search warrant and searched his home for child pornography. He admitted that he had been collecting child pornography since 2007 or 2008, but he said that at the time of the raid he had

Seth Wittner                                                                                    Page 2
December 9, 2016

been "getting out of it."

Mr. Wittner reported that he first began viewing pornography at the age of 14 or 15. Growing up in a suburb of New York City, he said, he would often go into the city to visit the library. At some point, he said, he began visiting porn shops in Times Square and watched adult films there, as he looked older than his age.

In his 30s, Mr. Wittner said, he was working as a music proofreader in Los Angeles and he read a story about a photo art project consisting of pictures of nude girls between the ages of 12 and 18 years old. He visited the UCLA library to view the photos, he said, and he acknowledged that he may have been aroused by these pictures.

Between the ages of 23 and 26, Mr. Wittner reported, he lived and worked in Oslo, Norway, where child pornography was still legal. While there, he said, he ordered adult pornography and when he received it, child pornography was packaged with it.

During the early years of the Internet, Mr. Wittner stated, he was involved in news groups, and they would sometimes exchange photos of nudist camps and other explicit pictures. He described having difficulty controlling his pursuit of pornography, and around 10 to 15 years ago he discovered torrents and file-sharing networks. He initially used these services just to download medical books to support his career as a physician's assistant, he said, but that eventually led to collecting pornography, which included child pornography.

The defendant stated that law enforcement confiscated two computers from his home, one being an old Macintosh that he said he had not accessed for child pornography in a few years. Another computer, also an Apple brand, was found in a guest bedroom. This was a newer unit, he said, and was taken with several external hard drives, one of which was broken. He estimated that at the time of the raid he likely was in possession of fewer than 100 files featuring child pornography, as he had begun to use specialty software to delete and clean his child porn files but he acknowledged he had not eliminated all of them.

Asked why he would delete some, but not all, of these files, the defendant explained that it was "psychologically difficult" to "get out of the habit" and was "weaning" himself off of child pornography "stepwise." Asked about the appeal of child pornography to him, the defendant said that adult porn did not interest him, citing "implants" and "bad acting" as reasons. He also noted that he had not been married for 40 years and he admitted that he found child pornography to be "arousing."

The defendant reported that much of the material he downloaded was videos that had been recorded in Thailand, usually in child brothels. He stated that a typical video would feature an adult male visiting one of these brothels, interacting with girls between the ages of 5 and 15 years old. The man would usually engage in "serial sex" with several girls in the brothel, he said, and

Seth Wittner  Page 3
December 9, 2016

had "a lot of shock value." He went on to say that he tended to avoid videos or pictures in which the children looked unhappy or crying. The defendant also reported viewing and downloading similar material from Russia.

Mr. Wittner stated that he has never been interested in male-on-male child pornography, but he said he would view scenarios involving adult women engaging in sexual activity with young boys. He said that group sex scenes were something that he has always been attracted to, and he also said that he liked boy-on-boy or boy-on-girl child porn, but such material was more difficult to find. He admitted that he has viewed some videos of bestiality with women, but he added that his taste for that kind of content was "on the wane." In addition to the child pornography, Mr. Wittner stated, he also had a fairly large collection of still pictures featuring what he described as being child erotica.

The defendant indicated that the height of his child pornography collecting and viewing was in 2014. He estimated that he interacted with this material 3 to 5 times a week, up to 5 or 6 hours at a time, downloading as many as 20,000 files. He indicated that he would look for new pornography about 4 times a week, some of which was adult pornography, but he expressed a preference for material that had "shock value," 95% of which was child pornography.

Mr. Wittner explained that in the year preceding his arrest in the present case, he had begun to reduce his child pornography collection, as he had found a "satisfactory substitute," downloaded files of a Japanese TV show of a sexual nature that features adults only.

The defendant stated that he would prefer to have an adult female sexual partner, explaining that such a relationship would be "more appropriate" and that "you can talk to an adult." He noted that there is a "power imbalance" in a relationship with a child that is problematic.

When questioned further about his attraction to child pornography, the defendant described how the girls in the videos he watched were "so willing and docile," feeding the fantasy of a man "being accepted and pleased by so many females." He also noted, as background, that he only had two dates in high school, and he talked of being "sheltered," "somewhat shy" and "socially awkward" growing up.

**PSYCHOSOCIAL HISTORY:**

Mr. Wittner reported that he was born in Brooklyn, New York and at the age of 5 moved to Long Island with his family, living there until he was 18. His father, he said, was a high school dropout tool and die maker who earned a GED and was a "hard worker." His mother taught Head Start and worked at a day care, he said. His only sibling was a sister, 5 years his junior.

Mr. Wittner described himself as being a good student, earning As and Bs, adding that he tended to focus on the subjects he liked. After graduating high school, he said, he enrolled at Reed

Seth Wittner  Page 4
December 9, 2016

College in Oregon, where he studied math. He also liked music and played the piano, he said, so after his Junior year he attended a music college for a year before returning to Reed, where he earned his degree in 1973. He subsequently took a music position in Oslo, he said, during which time he learned the language, then returned to Reed where he worked for a year as a dance accompanyist.

Mr. Wittner stated that during his time in Norway he had become interested in the language and culture there, so he enrolled in the Scandinavian studies program at the University of Wisconsin. He earned a Master's degree, he said, but realizing that there were few job prospects in that field, he moved to Los Angeles to pursue a career as a musician. He spent 10 years there, he said, where he did earn a living as a working musician and doing music proofreading.

Around the time that he turned 45 years old, the defendant said, his mentor in the music field contracted Parkinson's disease, and, feeling that he needed a "safety net" to music, he decided to pursue training in the medical field. He shadowed a couple of physician's assistants to get a better idea of what they did, he said, and he attended night school for 2 years earning science credits until he was accepting into a P.A. training program, from which he graduated in 1999,

The defendant stated that his first job as a P.A. lasted only a few months, as he was fired due to a conflict with the staff there. He then worked in a jail in Washington state and passed his board exam in January of 2000. In 2001 he worked for a dermatologist's office in Philadelphia, but that ended after only 2 weeks because the physician for whom he worked was arrested for steroid use. He went on to work in the ENT department at Temple University for 2 years, then for an ENT practice in Las Vegas, but that latter job was terminated because there was "not enough traffic."

For about 3 months, the defendant reported, he worked for Southwest Medical Associates, he said, which he described as a "horrible job" because his supervisors complained that he spent too much time on cases. He worked for a cardiology practice for 6 years, he said, but was laid off from that position along with other staff. He later took a job at a pediatric practice, but he was "let go" because he was "too expensive." For 8 months he worked as an independent contractor at the office of psychiatrist Karen Cruey, he said, doing medication management for psychiatric patients. Finally, for the past year, he reported, he has been working for Dr. Eugene Roseman.

The defendant denied any prior criminal arrests or charges. Asked about illegal drug use, he said that he used marijuana in college and during his time working as a musician, with his last use being about 4 years ago. He described himself as a social drinker but said that he consumes alcohol rarely, and he denied any other illegal drug use.

Regarding his mental health history, Mr. Wittner stated that he suffered from problems with depression at the age of 20 and saw a counselor at college once or twice. At the age of 38, he said, he underwent psychotherapy for about a year to help him better fit it with his Oklahoma coworkers. He has been taking Prozac since 2002, he reported, but he denied any history of

suicidal ideation. He stated that his therapist has wondered if he might have a high functioning form of autism spectrum disorder, noting that he would play piano up to 10 hours a day and learned Norwegian very quickly during his time in Oslo.

Reporting on his relationship history, Mr. Wittner stated that his first sexual experience was at the age of 18. He estimated that he has had a total of 50 sexual partners over his lifetime, attributing much of that number to his time as a musician. He stated that he has had 4 relationships that lasted 6 months or longer, including a marriage from 1978 to 1980. He said that the marriage failed because of a "culture clash," and he noted that he did not get along with her friends. She also wanted a child, he said, but he did not feel that they could afford to raise one.

Another relationship, with a girlfriend in college, lasted about a year, the defendant reported, during which time they shared a home with two other students. He attributed the demise of that relationship to his insecurity. At the age of 24, he dated another woman, who was studying art at the college, he said, but she eventually dropped out of school and returned to her home state. His final relationship, he reported, was with a Reed College professor who initiated the relationship, although they never lived together. He attributed his failure to have any other serious relationships to the fact that his job situation has been so unstable and because, when working as a musician, he rarely had much money.

Asked about his most unusual sexual experiences, the defendant stated that one of his girlfriends "shared" his semen from her mouth with him on a couple of occasions, something that she initiated. He also reported that he once paid to have sex with 2 prostitutes together, but he denied any other sexual contact with prostitutes.

The defendant reported that he was the victim of childhood sexual abuse when, at the age of 10, he was sexually touched by a camp counselor who also tried to make him perform oral sex. He never reported this to anyone, he said. In addition to this, the defendant asserted that he also understands what it is like to be sexually abused as a child from the stories of the patients that he treats in his psychiatric practice work.

**IMPRESSIONS AND CONCLUSIONS:**

It should be noted that the prediction of future behavior, even by trained mental health professionals, is of notoriously low accuracy when not scientifically guided, particularly with respect to relatively low frequency behavior such as criminal offenses. However, an individual's relative risk for offending can be estimated by considering a number of factors that have been empirically identified to be associated with sexual offenses. The defendant's risk was assessed using the Sex Offender Risk Appraisal Guide (SORAG), an instrument that consists of 14 distinct variables identified to predict future offense risk. When the SORAG was applied to the current case, it yielded a score of -21, which corresponds to a low risk to reoffend. The risk factors identified on the SORAG consisted of "no victim" and an absence of a diagnosis for

Seth Wittner                                                                                           Page 6
December 9, 2016

schizophrenia. On the accompanying violence risk assessment instrument, the Violence Risk Appraisal Guide (VRAG), the defendant received a score of -14, which also corresponds to the low risk range. The risk factors on the VRAG were the same as those on the SORAG.

With respect to the specific offense in this case, possession of child pornography, this report addresses the issue of whether Mr. Wittner has pedophilic tendencies and his risk of contact sexual offending against a child. Although there is no definitive test or assessment technique to detect the presence of pedophilia or a sexual attraction to children, research in this area has identified certain characteristics and behavioral tendencies that are more common among sexual offenders against children. Foremost among these is the subject's behaviorally expressed preference of sexual partner. Put another way, the type of partner the subject tends to seek out and engage with sexually is generally the best indicator of his sexual preference.

In a 2001 publication, researchers Seto and Lalumiere reported the development of the Screening Scale for Pedophilic Interests, which was found to correlate with phallometrically identified pedophilia and effectively predicted sexual recidivism. The scale consists of four items: having at least one male victim, having multiple victims, having at least one prepubescent victim, and having an unrelated victim. Other research by Seto and Eke (2005) looked at the likelihood that someone convicted of child pornography would subsequently commit a contact sexual offense. Their data revealed that in the absence of other criminal offense history, fewer than 2% of subjects went on to commit contact sexual offenses during the study period.

Applied to Mr. Wittner, the existing scientific research would appear to suggest that he exhibits few of the indicators typically associated with pedophilia, aside from his viewing of child pornography. Of greatest significance is the fact that he has multiple sexual relationships with adult women and has had over 50 sexual partners, again, adult women. Therefore, his overall sexual behavior demonstrates a strong preference for adult women, a preference he continues to express today.

Secondly, an application of the Screening Scale for Pedophilic Interests (SSPI) developed by Seto and Lalumiere reveals that when applied to Mr. Wittner, he receives a score of 0 out of a total possible 5 points. This indicates a low tendency for pedophilia and a concomitantly low risk for future sexual offending against children. This risk is further lowered by his lack of prior criminal offending, significant because psychopathy, which is clearly not present here, is one of the two primary characteristics associated with an elevated risk for contact sexual offending.

Thirdly, the research of Seto and Eke (2005) is instructive in the present case, as the available documents indicate that Mr. Wittner was convicted of a lone charge of child pornography possession with no other concurrent or prior criminal offense history. As noted above, this fact pattern is associated with an extremely low risk of future contact sexual offending. Taken together with the results from the SORAG, this suggests that Mr. Wittner's likelihood of sexually offending against any child is quite low for the foreseeable future.

Seth Wittner                                                                 Page 7
December 9, 2016


Based on a thorough review of the above facts in this case, a standardized empirical assessment instrument indicates this defendant to be a decidedly low risk to reoffend, either sexually or violently. He is a 64-year-old male who was previously married, has an extensive sexual history with adult females, has no prior history of criminal offending, no history of sexual offending, and significant educational attainment. Given the length of time since he has had a serious adult sexual relationship, and the amount of exposure he has had to child pornography and other such deviant materials, it may be helpful for him to participate in sex offender therapy to develop better interpersonal skills and sexual attitudes. However, even in the absence of such treatment he should remain a relatively low risk for future offending, particularly with respect to hands-on sexual offenses.

I appreciate having the opportunity to be of assistance in this case.

Mark J. Chambers, Ph.D.
Clinical and Forensic Psychologist
Nevada License PY267



January 14th, 2017

To Whom It May Concern:

This is a treatment summary letter for Seth Wittner. The client began individual therapy services with Daniel Berarducci, MA, CPC at Person-Holistic Innovations on August 6th, 2016. Overall, the client has engaged in 20 therapy sessions since the date of his first appointment to the noted date on this letter.

The client sought out mental health therapy services on his own volition in order to explore aspects within his life that lead to a significant legal based concern that the client self-disclosed to the writer. The client and writer have been able to engage in building awareness within the client's past and current experiences that lead the client to engaging in behavioral decisions that potentially sacrificed his personal and professional well-being. The client has been able to communicate his understanding of the significance of his legal based concern and how personal concerns within his emotional awareness from his past lead him to a decision that affected his societial engagements/interactions with others.

Overall, the client has been an active in willing participate in his therapy based services. The client has continued to explore the nature of his behavioral and emotion-based concerns, that led to his current legal matters. The client continues in engage in building insight and awareness within himself in order to actualize as an individual to assist his personal and professional decisions. If you have any additional questions, please have a HIPAA Release of Information form completed by the client and sent to my office contact information below, in order to discuss the nature of treatment for the client in a further manner.

Respectfully,

Daniel Berarducci, MA, CPC

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of May, 2017, I electronically filed the foregoing Sentencing Memorandum with the Clerk of Court using the CM/ECF system, which will send notification of such filing to Tony Lopez, Esq., Assistant U.S. Attorney, U.S. Attorney's Office, 501 Las Vegas Blvd. South, Suite 1100, Las Vegas, Nevada 89101.

_____
MICHAEL D. PARIENTE, ESQ.